FOR PUBLICATION [50]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                       :
CANADIAN NATIONAL RAILWAY,             :
                                       :
              Plaintiff,               :        Civil Action No. 09-4586 (FLW)
                                       :
       v.                              :
                                       :
                                       :                OPINION
VERTIS, INC. and AMERICAN COLOR        :
GRAPHICS,                              :
                                       :
              Defendants.              :
_____:

## WOLFSON, United States District Judge:

Presently before the Court is a Motion for Summary Judgment by Defendants Vertis, Inc.

and American Color Graphics (collectively "Defendants").  The instant motion arises out of a

Complaint filed by Plaintiff Canadian National Railway Company ("Plaintiff") against

Defendants for failing to pay tariff, circular and contract charges relating to the transportation of

rolled paper via freight boxcars.  For the reasons that follow, Defendants' motion is granted.

I.     BACKGROUND[1]

Plaintiff is a Canadian corporation with its principal place of business in Montreal,

Quebec. Am. Compl. ¶ 3. Defendants are printing companies that print advertisements for

various clients.  Defs' Statement ¶ 1.  Defendant Vertis is a Delaware corporation with a business

facility and registered agent in New Jersey.  Id.¶ 5. Defendant American Color Graphics is a New

_____

[1]Importantly, the Court notes that the parties agree that a majority of the relevant facts at
issue in this action are undisputed and, instead, the parties appear to dispute the legal effect of the
relevant facts.  Def's Br. at 2; Pl's Br. at 1.

1

York corporation with a registered agent in New York. Id. ¶ 6.  The instant  matter concerns an

agreement or agreements between Plaintiff and non-party St. Mary's Paper Company Ltd. ("St.

Mary's"), an insolvent Canadian paper producer, pursuant to which Plaintiff agreed to ship paper

to Defendants. Defs.' Statement ¶¶ 2, 5; Defs' Ex. C, Jones/Dube Aff. ¶¶ 7-9.

  Specifically, in September and October 2006, Defendants or clients of Defendants

ordered rolled paper from St. Mary's.  Defs' Statement ¶ 4.  St. Mary's billed Defendants for the

cost of shipping and Defendants or Defendants' clients paid St. Mary's for the 57 shipments

including the cost of the paper and the accompanying freight charges.  Defs' Fact Statement ¶ 25.

  In addition to contracting with Defendants for the purchase of paper,  St. Mary's

independently agreed with Plaintiff to provide rail service to ship the paper.  Id. at ¶¶ 5-6; Defs'

Ex. C, Jones/Dube Aff. ¶¶ 9,10.  To initiate the shipping, St. Mary's would inform Plaintiff that

it wanted to transport a shipment of paper and would select the applicable tariff with rates

dictated by private agreements between Plaintiff and St. Mary's.  Defs.' Statement ¶¶ 7,8; Pl's

Fact Statement ¶¶ 7,8.

  Importantly, each of the paper shipments was made via boxcar; indeed, for each

shipment, Plaintiff would provide St. Mary's with a boxcar in which to load the paper at St.

Mary's facility for shipping.  Id. ¶ 9.  After loading the paper into the boxcar provided by

Plaintiff, St. Mary's would notify Plaintiff through an electronic bill of lading that the boxcar was

ready for transport.  Id. at ¶ 10.  The bills of lading were marked pre-paid and named Defendants

as the consignee.  Id. ¶ 21;  Defs.' Ex. G.  Only Plaintiff and St. Mary's received the bills of

lading for each shipment.  Id. ¶ 11; Pl's Resp. Statement ¶ 11.

  After receiving a bill of lading, Plaintiff would send an invoice to St. Mary's for the

relevant freight charges. Defs.' Statement ¶¶ 14-15. Plaintiff did not have a contractual

agreement with any party other than St. Mary's to pay for the freight charges it incurred while

fulfilling the St. Mary's contract and shipping the paper to Defendants.  Id. at ¶ 18. Indeed, not

only was St. Mary's the only party that was billed by Plaintiff, it was also the only party to pay

Plaintiff for the relevant freight charges.  Id. at ¶ 20; Pl's Resp. Fact Statement ¶ 20.  Plaintiff

never billed Defendants for any of the shipments. Id. at ¶ 28; Id. ¶ 28.  Pursuant to the agreement

or agreements with St. Mary's, Plaintiff made 57 shipments of paper to Defendants between

September and October 2006.  However, before St. Mary's paid Plaintiff the freight charges, St.

Mary's filed for bankruptcy in Canada.  Pl's Br. at 3.

        In September 2009, Plaintiff filed the instant Complaint against Vertis only, alleging that

Vertis was liable for $272,372.19 in unpaid freight costs under the Interstate Commerce Act

("ICA"), 49 U.S.C. § 10743(a)(1).[2]  Subsequently, in April 2010, Plaintiff filed an Amended

Complaint against Vertis and American Color Graphics to recover a lesser amount,

$263,983.13[3], in  freight costs it incurred as a result of the St. Mary's contract.  Id. In addition to

adding American Color Graphics as a Defendant, Plaintiff alleged two new bases for Defendants'

liability for the freight costs associated with the St. Mary's Contract.  First, Plaintiff alleged that

---

[2] Section 10743(a)(1) of the ICA provides, in relevant part, "Liability for payment of rates
for transportation for a shipment of property by a shipper or consignor to a consignee other than
the shipper or consignor, is determined under this subsection when the transportation is provided
by a rail carrier under this part. When the shipper or consignor instructs the rail carrier
transporting the property to deliver it to a consignee that is an agent only, not having beneficial
title to the property, the consignee is liable for rates billed at the time of delivery for which the
consignee is otherwise liable. . ." 49 U.S.C. § 10743(a)(1).

[3] The Amended Complaint alleges only $263,983.13 in damages because Plaintiff
received a 3% dividend from St. Mary's bankruptcy estate. Am. Compl. ¶ 8.

Defendants were liable for the freight costs under a theory of quantum meruit.  Id. at ¶¶ 13, 16.  In addition, Plaintiff contends that Defendants were unjustly enriched at Plaintiff's expense and, therefore, that Plaintiff is entitled to recover the value of the shipping, i.e., a benefit it allegedly conferred upon Defendants.  Id. at ¶¶ 20-21.

II.     STANDARD OF REVIEW

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n. 1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56(c). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002).  For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Kaucher, 455 F.3d at 423.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258

(D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. <u>Anderson</u>, 477 U.S. at 256-57.  "A nonmoving party may not 'rest upon mere allegations, general denials or… vague statements."  <u>Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs</u>, 982 F.2d 884, 890 (3d Cir. 1992) (quoting <u>Quiroga v. Hasbro, Inc.</u>, 934 F.2d 497, 500 (3d Cir. 1991)). Moreover, the non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." <u>Woloszyn v. Cnty of Lawrence</u>, 396 F.3d 314, 319 (3d Cir. 2005). Indeed, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. <u>Celotex</u>, 477 U.S. at 322.

Moreover, in deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. <u>Anderson</u>, 477 U.S. at 249.  Credibility determinations are the province of the fact finder.  <u>Big Apple BMW, Inc. v. BMW of N. Am., Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992).

III. DISCUSSION

    A.   <u>Consignee Liability Under the Interstate Commerce Act</u>

In the Complaint, Plaintiff alleges that because Defendants were named as consignees on the bills of lading for the shipments sent pursuant to the St. Mary's contract, they are liable for the remaining freight charges under 28 U.S.C. § 10743(a).  Specifically, section 10743(a)(1)

provides, in relevant part, that a party, "if named on the bill of lading as the sole consignee, is presumptively liable for [associated freight charges], unless it accepts the freight as the agent of another and notifies the carrier of its status in writing." CSX Transportation Co. v. Novolog Bucks County, 502 F.3d 247, 250 (3d Cir. 2007).   In this motion, Defendants argue that they are not liable under the ICA because the Interstate Commerce Commission ("ICC") "exempted boxcar rates from its regulation." See MKT R.R. Co., 4 I.C.C. 2d 736, 737 (1988) (citing Exemption from Regulation-Boxcar Traffic, 367 I.C.C. 424 (1983)).   In its opposition to Defendants' motion, Plaintiff concedes that because the relevant shipments were made by boxcar, Defendants are not liable under the ICA.  Pl's Br. at 4.  Thus, the Court grants summary judgment to Defendants on Plaintiff's claims under the ICA.

B.    Quantum Meruit

Next, Plaintiff alleges that Defendants are liable under a theory of quantum meruit. Am. Compl. ¶¶ 16, 20-21.   Specifically, Plaintiff alleges that "by their actions and course of dealing" the parties "directly or indirectly came to a mutual agreement, whereby Defendants requested freight and rail transportation services from Plaintiff."  Compl. ¶ 13.  Thus, Plaintiff contends that because it performed valuable services for the Defendants for which it has not recovered, Defendants are liable for the unpaid freight costs.  Id. ¶ 16. The Court does not agree.

Quantum meruit is a form of quasi-contract that enables the performing party to recover the reasonable value of the services rendered. Weichert Co. Realtors v. Ryan, 128 N.J. 427, 437–38 (1992).  In quantum meruit "it is well settled that where one performs services for another at his request, but without any agreement or understanding as to wages or remuneration, the law implies a promise on the part of the party requesting the services to pay a just and

reasonable compensation." Kopin v. Orange Prods., 297 N.J.Super. 353, 367–68

(App.Div.1997)(emphasis added).   Quantum meruit's underlying principle is that "a person shall

not be allowed to enrich himself unjustly at the expense of another." Id. (quoting Weichert Co.

Realtors v. Ryan, 128 N.J. 427, 437 (1992) (internal quotations omitted).  This type of

quasi-contractual recovery allows the "performing party to recoup the reasonable value of

services rendered." Ryan, 128 N.J. at 437-38 (citing Marta v. Nepa, 385 A.2d 727 (Del. 1978));

Edens View Realty & Inv. v. Heritage Enters., 408 N.E.2d 1069, 1075 (1980)).  To recover under

quantum meruit, a plaintiff must establish: (1) the performance of services in good faith; (2) the

acceptance of the services by the person to whom they are rendered; (3) an expectation of

compensation therefore; and (4) the reasonable value of the services. Starkey, Kelly, Blaney &

White v. Estate of Nicolaysen, 172 N.J. 60, 68 (N.J. 2002) (quoting Longo v. Shore & Reich,

Ltd., 25 F.3d 94, 98 (2d Cir. 1994)) (internal quotations and citations omitted).  Importantly, and

in relevant part, to satisfy the third element, a plaintiff "must establish that the services were

performed with an expectation that the beneficiary would pay for them, and under circumstances

that should have put the beneficiary on notice that the plaintiff expected to be paid." Ryan, 128

N.J. at 438.

   In the instant matter, the Court finds that Plaintiff has failed to establish its ability to

recover under a theory of quantum meruit.  Specifically, the Court notes that Plaintiff has entirely

failed to demonstrate an expectation on the part of Defendants that they would pay Plaintiff for

the freight costs associated with the shipment of paper from St. Mary's nor that had any  notice

that Plaintiff expected them to pay.   Defs.' Fact Statement at ¶¶ 20, 28.  Plaintiff did not have a

contract or agreement with Defendants concerning the shipments of paper, and, indeed, the

undisputed facts demonstrate that St. Mary's, not Defendants, requested the shipping services

from Plaintiff.  Def's Fact Statement ¶ 5.   Moreover, the parties agree that historically, when

Plaintiff billed St. Mary's for freight costs, no entity other than St. Mary's paid those invoices.

Indeed, the parties agree that Plaintiff did not bill Defendants for the freight costs associated with

the shipping of paper.  Id.  As discussed above, Defendants or Defendants' clients paid St. Mary's

directly for the cost of the paper and the freight charges and had no interaction with Plaintiff.   Id.

at ¶¶ 5, 6, 24-26.

    Moreover, it is undisputed that the bills of lading concerning the relevant shipments

indicated that the shipments were "prepaid", an indication that, if anything, St. Mary's had

already paid for the costs of shipping.  Defs.' Ex. G.  In that regard, to the extent that Plaintiff

argues that because the bills of lading listed Defendants as consignee, the bills created an

expectation on the part of Defendants that they would pay for the shipping, the Court does not

agree.  Indeed, it is undisputed that Defendants did not receive either the bills of lading generated

by St. Mary's concerning the individual shipments or the invoices generated by Plaintiff for each

shipment.  Def's Fact Statement ¶¶ 11, 16; Pl's Fact Statement ¶¶ 11, 16.

    Even if Defendants had received the bills of lading, it is well-established that a bill of

lading can function as "both a basic transportation contract between a consignor and a carrier and

as a receipt." Estes Express Lines, Inc. v. Macy's Corp. Services, No. 08-3582, 2010 U.S. Dist.

LEXIS 6926, at *17 (D.N.J. Jan. 28, 2010) (citing S. Pac. Transp. Co. v. Commercial Metals Co.,

456 U.S. 336, 342 (1982)).  By default, "the consigner remains primarily liable for the freight

charges" under a bill of lading.  Id. at *18. Moreover, "when a separate contract is executed, the

bill of lading serves only as a receipt for the transfer of the goods, and will not serve to alter the

terms of the previous agreement." Id. (citing Vanlab Corp. v. Blossom Valley Foods Corp., No. 04-6183, 2005 U.S. Dist. LEXIS 1086, at *3 (W.D.N.Y. Jan. 10, 2005)) (emphasis added).  In the instant matter, because there was a separate agreement or agreements between St. Mary's and Plaintiff concerning the shipping of the paper, as well as a separate agreement between St. Mary's and Defendants concerning the purchase of paper,  it appears that the bills of lading acted only as receipts for the transfer of goods and would not serve to "alter the terms of the previous agreement." Id. at *18.

For all these reasons, the Court finds that Plaintiff has failed to establish an expectation of payment from Defendants nor has it established that Defendants expected to pay Plaintiffs for the freight costs associated with the paper shipments.  Thus, Plaintiff, as the contracting party, "must look for payment to . . . the one who is expected to pay and who is in fact expected to pay as a reasonable man should have expected to pay." Insulation Contracting & Supply Co v. Kravco, Inc., 209 N.J. Super 367, 379 (App. Div. 1986).  As a result, the Court will grant summary judgment to Defendants on Plaintiff's claim for quantum meruit.


C.      Unjust Enrichment

Next, Plaintiff alleges that Defendants are liable for the unpaid freight charges under a theory of unjust enrichment.  Specifically, Plaintiff contends that it conferred a benefit upon Defendants by providing them with freight services and that it would be "inequitable to allow Defendants to retain the benefit" of those services without payment.  Compl. ¶¶ 18, 20.  In response, Defendants argue that, as with Plaintiff's quantum meruit claim, neither party expected Defendants to pay for the freight costs, thus, the unjust enrichment claim fails.  The Court agrees.

"To recover under a quasi-contract theory of unjust enrichment, the plaintiffs must prove that defendant was enriched . . . received a benefit, and that retention of the benefit without payment therefor [sic] would be unjust." Callano v. Oakwood Park Homes Corp., 91 N.J. Super. 105, 109 (App. Div. 1966). Under New Jersey law, a claim under the quasi-contractual theory of unjust enrichment has two essential elements: "(1) that the defendant has received a benefit from the plaintiff, and (2) that the retention of the benefit by the defendant is inequitable." Wanaque Borough Sewerage Auth. v. West Milford, 144 N.J. 564, 575 (1996).

Initially, the Court notes that because Defendants paid St. Mary's for the costs of the paper and the shipping, unlike a typical claim of unjust enrichment, Defendants here are not retaining a benefit "without payment."  See, e.g., Callano, 91 N.J. Super. at 109.   Moreover, the Court finds that facts in Callano to be analogous to those before me.  In Callano, a non-party entered into a contract to purchase a house from defendant. 91 N.J. Super. at 107.  In addition, prior to purchasing the house, the non-party also contracted with plaintiffs to deliver and plant shrubbery on the property.  Id.  The non- party never paid plaintiffs for the costs of the shrubbery and died before purchasing the house from defendant. Id.  Defendant had no knowledge of the non-party's failure to pay plaintiffs for the shrubbery.  Id. Plaintiffs subsequently sued defendant for the value of the shrubbery on a quasi-contract theory of liability.  Id. There, the court held that the plaintiffs could not recover from defendant for the cost of the shrubbery.  Id.  Indeed, the court explained that to successfully assert a theory of unjust enrichment a plaintiff must expect " remuneration from the defendant, or if the true facts were known to plaintiff, he would have expected remuneration from defendant, at the time the benefit was conferred. . . . It is further noted that quasi-contract cases involve either some direct relationship between the parties or a

mistake on the part of the person conferring the benefit." Id. at 109.   Importantly, however, the

Callano court also explained  that "a plaintiff is not entitled to employ the legal fiction of

quasi-contract to substitute one promisor or debtor for another." Id. at 110 (quotations omitted);

see also MK Strategies, LLC v. Ann Taylor Stores Corp., 567 F. Supp 729, 735 (D.N.J. 2008).

Moreover, the court noted that because plaintiffs in Callano had "no dealings with defendant, and

did not expect remuneration from it when they provided the shrubbery," they could not recover

under a theory of unjust enrichment and, instead, that plaintiffs' only remedy was with the non-

party's estate, "since they contracted with and expected payment to be made by [the third party]

when the benefit was conferred." Id. at 109-10.

   Similarly, in the instant matter, the parties did not have a contract concerning the

shipment of paper from St. Mary's.   Defs' Statement ¶¶ 18, 27.  Moreover, the parties in this

matter did not have  a "direct relationship."  See, e.g., Defs' Ex. D, Hogben Deposition ("Hogben

Dep.") 74-77; Callano, 91 N.J. at 109.  Instead, as discussed above, St. Mary's billed Defendants

for the cost of the paper and the shipping and independently contracted with Plaintiff to provide

rail service to ship the paper.  Defs' Statement ¶¶ 5,6; Pl's Resp. Fact Statement ¶¶ 5,6.

Moreover, while Defendants paid St. Mary's for the cost of the paper and the freight charges,

Defs' Fact Statement ¶ 25, Defendants did not receive the bills of lading or the invoices for the

shipments; instead, only Plaintiff and St. Mary's received the bills of lading and invoices for each

shipment.  Defs' Statement ¶¶ 11,16; Pl's Resp. Fact Statement ¶¶ 11,16.   Indeed, Plaintiff did

not have a contractual agreement with any party other than St. Mary's to pay for the freight

charges it incurred while shipping the paper to Defendants.  Thus, as in Callano, Plaintiffs cannot

succeed on a theory of unjust enrichment to recover for the costs of the shipment from

Defendants and Plaintiffs cannot employ quasi-contract to "substitute one promisor or debtor for another." Callano, 91. N.J. Super. at 110.  Indeed, as the court explained in Callano, Plaintiff's remedy lies with the party with whom it had contracted and not a third party who may have benefitted from the transaction.  See Callano, 91 N.J. at 110.  Moreover,  the Court finds additional support for this conclusion since Plaintiff has already partially recovered from St. Mary's as a result of the Canadian bankruptcy proceeding. Defs.' Ex. D.  As a result, the court will grant summary judgment to Defendants on Plaintiff's claim of unjust enrichment.

        D.      Common Law Consignee Liability

       Plaintiff next argues that, independent of the ICA, "a consignee who accepts delivery of the shipped goods is also liable for the freight charges" under "federal and state common law." Pl.'s Mem., 4, 7.  In response, Defendants argue that not only is Plaintiff's claim of common law consignee liability preempted by the ICA exemption, but because Plaintiff did not include this theory in either its Complaint or Amended Complaint, it cannot raise this theory in opposition to the instant summary judgment motion.  The Court agrees.

       It is well-established that "adding claims to a pleadings is properly done by amending the complaint; it is too late to introduce an additional claim at the summary judgment stage."  Tirone v. Trella, No. 03-257, 2007 WL 3170098, at *6 (D.N.J. Oct. 29, 2007); see also Carr v. Gillis Associated Industries, Inc., 227 Fed. App'x 172, 176 (3d Cir. 2007) ("District Courts have broad discretion to disallow the addition of new theories of liability at the eleventh hour."); Speziale v. Bethlehem Area Sch. Dist., 266 F.Supp.2d 366, 371 n. 3 (E.D.Pa.2003) ("Plaintiff's counsel cannot reasonably expect to amend the complaint after the close of discovery merely by raising new arguments in the responsive papers" to a motion for summary judgment.); OTA P'ship v.

Forcenergy, Inc., 237 F.Supp.2d 558, 561 n. 3 (E.D.Pa.2002) (holding that a new claim that was first raised in opposition to a motion for summary judgment was "too late").  In the instant matter, because Plaintiff did not include a claim of common law consignee liability in either its Complaint or Amended Complaint, and, instead, only raised it for the first time in opposition to Defendants' summary judgment motion, Plaintiff's new claims are untimely.

However, even assuming, arguendo, that this Court would consider Plaintiff's claim of common law consignee liability – i.e., that under common law, a consignee is always liable for freight charges –  the Court finds that this claim is barred by the ICA.

The ICA was enacted to "achieve uniformity in freight transportation charges, and thereby to eliminate the discrimination and favortism that had plagued the railroad industry in the late 19th century."  S. Pac. Transp. Co. v. Commercial Metals Co., 456 U.S. 336, 344 (1982).  Pursuant to the ICA, "[t]he remedies available against rail carriers with respect to rail rates, classifications, rules and practices are exclusively those provided by the Interstate Commerce Act, as amended, and any other federal statues which are not inconsistent with the Interstate Commerce Act.  No state law or federal or state common law remedies are available."  G.& T. Terminal Packaging Co., Inc. v. Consol. Rail Corp., 830 F.2d 1230, 1234 (3d Cir. 1987) (quoting H.R. Rep. No. 96-1430 (1980)).

In 1983, the ICC exempted boxcar shipments from ICA regulation because it determined that "the regulations were unnecessary to implement the national transportation policy and because the regulations were not needed to protect shippers from an abuse of market power."  Brae Corp. v. United States, 740 F.2d 1023, 1036 (D.C. Cir. 1984).  In part , the ICC found that "the pervasive pattern of competition between trucks and rails" removed the need to regulate the

pricing of boxcar shipments. Id. at 1035-36.  The effect of the boxcar exemption "is to allow shippers and carriers freely to determine the terms of transportation arrangements among themselves." Missouri-Kansas-Texas R.R. Co. Joint Petition for Declaratory Order ("MKT R.R. Co.", 4 I.C.C. 2d 736, 738 (1988).  Thus, exempted shipments are "governed by the agreement between the parties and the principles of contract law." Id. at 737.

Importantly, however, the mere fact that a shipment is exempt from regulation under the ICA does not permit a party to revive common law causes of action preempted by the ICA. See G&T Terminal Packaging Co., Inc. v. Consol. Rail Corp., 830 F.2d 1230, 1234-36 (3d Cir. 1987) (explaining that the remedies against rail carriers with respect to rail rates, classifications and practices "are exclusively those provided by the [ICA] . . .no state law or federal or state common law remedies are available," and, ultimately holding that "we agree with the district court that the shippers' common law claims, whether considered as arising under state or federal common law, are preempted.")  Indeed, with regard to the specific boxcar exemption at issue in this matter, the Surface Transportation Board has explained:

> The effect of the exercise of our exemption authority under 49 U.S.C. §10505 is to allow shippers and carriers freely to determine the terms of transportation arrangements among themselves. The role of a court in this deregulated environment is to adjudicate disputes concerning agreements between these parties, just as it would adjudicate other agreements or contracts. There are, however, some limits to the court's jurisdiction concerning unregulated movements. An exemption does not revive certain common law remedies that were preempted by the Interstate Commerce Act. . . The exemption does not create a regulatory vacuum which allows common law or State statutes to govern the regulation of rail rates and practices in interstate commerce. Rather, we still have plenary jurisdiction over these matters, but have determined not to exercise it based on a finding that an absence of regulation would promote the goals of the Federal rail transportation policy (RTP) of 49 U.S.C. §10101a by allowing carriers and shippers to negotiate the terms of transportation freely. In these circumstances, although common law common carrier remedies are not available, courts are free to adjudicate contract matters concerning exempt transportation by

14

interstate rail carriers.

MKT R.R. Co., 4 I.C.C. 2d at 738 (emphasis added).

In the instant matter, the parties agree that because the shipments at issue were made by boxcar, the ICA does not apply and, thus, that the shipments are exempt from regulation under the ICA. As a result, Plaintiff appears to argue that because the shipments are exempt from regulation under the ICA, it can recover under a theory of common law consignee liability. Plaintiff is wrong.

Initially, the Court notes that although Plaintiff cites numerous cases in support of the proposition that consignee liability exists separate and apart from the ICA, the cases Plaintiff cites do not, in fact, support that proposition. Conversely, it appears that, unlike the matter before me, the cases cited by Plaintiff were decided under the ambit of the ICA, and, therefore, the ICA's consignee liability applied in those cases. See, e.g., Pittsburgh C.C. & St. L. Ry. Co. v. Fink, 250 U.S. 577, 581-2 (1919)("The transaction, in the light of the act, amounted to an assumption on the part of Fink to pay the only legal rate the carrier had the right to charge or the consignee the right to pay.")(emphasis added); New York Cent. & Hudson R.R. Co. v. York & Whitney Co., 256 U.S. 406 (1921); Louisville & Nashville R. Co. v. Central Iron & Coal Co., 265 U.S. 59 (1924); Central States Trucking Co. v. J.R. Simplot Co., 965 F.2d 43, 432 (7th Cir. 1992)("Central States Trucking Company ("Central States"), an interstate common freight carrier, brought this collection action pursuant to the Interstate Commerce Act, 49 U.S.C. § 1, et seq., against J.R. Simplot Company ("Simplot") for shipping charges related to Simplot's freight.")(emphasis added); Illinois Steel Co. v. Baltimore & Ohio Railroad Co., 320 U.S. 508 (1944). Moreover, Plaintiff has not cited anything to support the existence of common law

consignee liability outside of the ambit of the ICA.   Thus, the Court will grant summary

judgment to Defendant on Plaintiff's claims for consignee liability.


**IV. CONCLUSION**

    For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED.



Dated: August 16, 2011              /s/ Freda L. Wolfson     

                                      Freda L. Wolfson, U.S.D.J.